OPINION
{¶ 1} Gem City Metal Spinning Company ("Gem City") appeals from the *Page 2 
judgment of the Common Pleas Court of Montgomery County, which affirmed a decision of the City of Dayton Board of Zoning Appeals adverse to Appellant. The action was commenced by the Zoning Administrator for the City of Dayton ("City"), alleging that Gem City's inventory of regulated substances on site exceeded its established Total Maximum Daily Inventory of 2155 pounds.
 {¶ 2} The relevant history of the property at issue, 2127 Old Troy Pike in Dayton, Ohio, begins in 1988 with the adoption of the City's Well Field Protection Program-ordinance nos. 27788 27789. The program established a Well Field Protection Overlay District, whose purpose is expressly stated in section 150.610 of the Revised Code of General Ordinances:
 {¶ 3} "The WP Well Field Protection Overlay District is designed to safeguard the public health, safety and welfare of citizens and institutions that are customers of the Dayton Water System by regulating the land use and storage, handling, use and/or production of Regulated Substances within the zone * * * . The intent of this designation is toprotect the community's potable water supply againstcontamination." (Emphasis added.)
 {¶ 4} As part of this program, the use of regulated substances, defined as chemicals and mixtures of chemicals which are health hazards, is limited to 20 gallons or 160 pounds at any one time. RCGO 150.613(A)(1). Also, the total use of regulated substances may not exceed 50 gallons or 400 pounds in any 12 month period. RCGO 150.613(A)(2).
 {¶ 5} When the ordinances were passed in 1988, there were approximately 175 *Page 3 
nonconforming properties in the overlay district. While these properties were not subject to the weight limitations of regulated substances prescribed by the ordinances, any owner or occupant of these properties was required to file Regulated Substance Activity Inventory Reports ("RSAIR") at 24 month intervals. RCGO 53.03(A)(1). The purpose of the reports was to certify the types and amounts of regulated substances on premises within the overlay district for emergency control.
 {¶ 6} In 1988, Miami Valley News Agency, Inc. ("MVNA") owned the property at issue in this appeal. At that time, MVNA was using an underground storage tank to store gasoline, which is a regulated substance, for its delivery vehicles. That tank held 2000 gallons or 16,000 pounds of fuel. MVNA was also using 2155 pounds of regulated substances beyond those held in the underground storage tank. In total, the premises stored, handled, and/or used 18,155 pounds of regulated substances when the Well Field Protection Program became effective.
 {¶ 7} In August 1989, MVNA submitted its first RSAIR, indicating that 1941 pounds of regulated substances were being used on the property. Later that same year, MVNA removed the underground storage tank, intending to replace it with one in compliance with the City's new ordinances. According to RCGO 150.613(F), "* * * nonconforming uses in this district presently utilizing underground storage tanks for fuel and lubricants for vehicle operations and fuel for building and/or processing heating shall be permitted to replace existing tanks with those constructed as per the specifications of 150.613(E) above [underground tanks secondarily contained and monitored] and not exceeding the capacity of existing tanks." However, when a new *Page 4 
tank was purchased and delivered, MVNA discovered that it was a single-wall tank. Discouraged by the cost of replacing the now-removed existing tank, MVNA decided to purchase gasoline for its delivery vehicles off-site.
 {¶ 8} Thereafter, MVNA conducted its business without the additional pounds included in the underground storage tank. In 1991, MVNA reported in its RSAIR that it utilized 1900 pounds of regulated substances; in 1993, 1947 pounds; and in 1995, 2155 pounds.
 {¶ 9} The City passed an amendment to the Well Field Protection Program in 1995. The amendment provided, in part, that "[t]he zoning administrator shall determine the intensity of each use within this district utilizing the Total Maximum Daily Inventory and the Facility Hazardous Potential Rating. The two values shall be derived from theRegulated Substance Activity Inventory Report(s) submitted by anexisting or proposed new use in accordance with Section 53.30, and fromdata collected through inspections. * * * No existing use shall handle an amount of Regulated Substances in excess of its Total Maximum Daily Inventory, * * *." (Emphasis added.) RCGO 150.3233(E). Based on (1) the RSAIR's submitted by MVNA between 1989 and 1995, (2) discussions with MVNA, and (3) research generated by the Well Field Protection Program staff, the City's Zoning Administrator subsequently established the Total Maximum Daily Inventory ("TMDI") for the property as 2155 pounds. He further determined that use of the underground storage tank had been voluntarily discontinued pursuant to RCGO 150.414 (F)(1) (2).
 {¶ 10} Gem City purchased the property in 1997. At that time, Mike Gearhardt, *Page 5 
one of the owners of Appellant-company, discussed with MVNA about correcting the property's TMDI with the City. Gearhardt testified that the City responded by saying he could take the issue to the zoning board and then appeal that decision to the Montgomery County Common Pleas Court. However, it was Gearhardt's understanding that no action could be commenced until the property no longer complied with the City's ordinances. Subsequently, Gem City submitted an RSAIR in 1999 stating that it had used 2155 pounds of regulated substances; in 2001, it reported using 2155 pounds; and in 2003, it reported using 0 pounds. According to Gearhardt, the company used synthetic oils during this time period in order to remain compliant with the ordinances. In 2005, as a result of an increase in business, Gem City reported that it had used 9131 pounds of regulated substances — 6976 pounds in excess of its recorded TMDI.
 {¶ 11} On August 26, 2005, Gem City was served with a legal notice of violation, asserting that the company's inventory on site exceeded the Total Maximum Daily Inventory of 2155 pounds. Gem City appealed this violation to the Board of Zoning Appeals. The board affirmed the decision of the Zoning Administrator, finding that the underground storage tank which previously had stored an additional 16,000 pounds of regulated substances had been voluntarily removed by the property's former owner. As such, the property's TMDI was appropriately set at 2155 pounds pursuant to RCGO 150.3233(E)(1). Gem City's use in excess of that recorded TMDI amount constituted a violation of this section.
 {¶ 12} Gem City thereafter appealed the board's decision to the Montgomery County Common Pleas Court. Affirming the board's decision, the court found that *Page 6 
MVNA had voluntarily discontinued the use of the underground storage tank by failing to replace it. Specifically, the court noted that evidence of non-use, the decision to fuel its delivery vehicles off-site, and omission of the tank's storage capabilities from submitted RSAIR's demonstrated MVNA's voluntary discontinuance of this nonconforming use. Furthermore, the court found that exclusion of the underground storage tank from the TMDI did not amount to a deprivation of an investment that existed prior to the enactment of the City's ordinances. According to the court, the investment diminished upon the voluntary removal of the tank and MVNA's decision not to replace it.
 {¶ 13} Gem City has filed a timely notice of appeal from this decision and assigns the following errors for our review:
 {¶ 14} I. "The Court of Common Pleas abused its discretion by holding that the Program's regulation of a nonconforming property's `inventory' was constitutional."
 {¶ 15} II. "The Court of Common Pleas abused its discretion by holding that the previous owner of the Property `voluntarily abandoned' a legally established nonconforming use."
 {¶ 16} III. "The Court of Common Pleas abused its discretion by holding that Ohio law permits zoning regulations to incrementally retract a nonconforming use."
 {¶ 17} The standards of review for a court of common pleas and an appellate court differ considerably when an administrative appeal is involved. In the case of In re Application for Conditional Use ofWatkins (Feb. 18, 2000), Montgomery App. No. 17723, 2000 WL 192430, this Court confirmed that a court of common pleas must "`determine whether there exists a preponderance of reliable, probative, and substantial *Page 7 
evidence'" to support an agency decision. Id. at *2, quotingDudukovich v. Lorain Metro. Hous. Auth. (1979), 58 Ohio St.2d 202, 207,389 N.E.2d 1113. Furthermore, the trial court must presume that the agency decision is "`reasonable and valid.'" Id., quoting CommunityConcerned Citizens, Inc. v. Union Twp. Bd. of Zoning Appeals (1993),66 Ohio St.3d 452, 456, 613 N.E.2d 580. Thus, the trial court must affirm the decision of the administrative agency if it is "supported by a preponderance of reliable, probative and substantial evidence." Id., citing Dudukovich, 58 Ohio St.2d at 207.
 {¶ 18} In contrast, when an appellate court reviews a trial court's decision regarding an agency order, the appellate court uses two distinct standards of review. Lamar Outdoor Advertising v. Dayton Bd. ofZoning Appeals (June 21, 2002), Montgomery App. No. 18902,2002 WL 1349600, at *2. On questions of fact, an appellate court's review is limited to an abuse of discretion. Id. (citation omitted). An abuse of discretion exists where the trial court's attitude is unreasonable, arbitrary or unconscionable. Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621, 614 N.E.2d 748. However, on questions of law, an appellate court's review is de novo. Ohio Dept. of Commerce, Div. ofReal Estate v. DePugh (1998), 129 Ohio App.3d 255, 261, 717 N.E.2d 763. Thus, we apply the same standards of the trial court without deference to the trial court's decision. Brinkman v. Doughty (2000),140 Ohio App.3d 494, 497, 748 N.E.2d 116.
 {¶ 19} For the following reasons, we find that Gem City's arguments lack merit. Accordingly, the judgment of the court of common pleas will be affirmed. *Page 8 
 I {¶ 20} In its first assignment of error, Gem City argues that the City's regulation of a nonconforming property's inventory is unconstitutional. According to the appellant, zoning regulations are enacted to regulate property use, not the amount of inventory maintained on the property. To support its contention, Gem City cites State ex rel.Zoning Inspector of Montgomery Cty. v. Honious (1969),20 Ohio App.2d 210, 49 O.O.2d 289, 253 N.E.2d 301. There, this Court addressed the issue of whether a nonconforming junk yard was permitted to continue its operation in an Agricultural A-1 District, where the defendant enlarged his use of the property by increasing the number of junk cars on the premises but remaining within the five-acre area. This Court distinguished an increase in "use" from an increase in "area," providing that "[n]onconforming use restrictions apply to area rather than inventory." Id. at 212. Accordingly, we found that the defendant's storage of more junk cars on his land did not violate the subject ordinance, which provided that "[n]o existing building or land area devoted to a use not permitted by this resolution in the district in which such building or land area is located, * * * shall be enlarged, extended, reconstructed, substituted or structurally altered, unless the use thereof is changed to a use permitted in the district in which such building or land area is located." Id. at 211. By analogy, this Court likened the defendant's increase in business to an increase in inventory of a grocery store whose building is located in a residential district — an increase in business alone does not constitute an unlawful extension of a nonconforming use. Id. at 212. *Page 9 
 {¶ 21} Here, the trial court correctly pointed out that the instant situation and subject ordinances are distinguishable from those inHonious. RCGO 150.160 regulates both land use and the storage, handling, use and/or production of regulated substances. Gem City's property is an I-1, light industrial, zoned property located within the Well Field Protection overlay district. Its land use as an industrial manufacturing site is confined to a one-story building encompassing 43,000 square feet. Moreover, RCGO 150.613 provides that the the amount of regulated substances that may be used on properties within this district may not exceed 20 gallons or 160 pounds at any one time, or 50 gallons or 400 pounds in any 12 month period. Where the ordinance in Honious expressly addressed "area" only, the Well Field Protection Program purports to regulate "area" as well as "use." A better analogy in this case may be the limitations placed on a pet store in a residential district to the number of animals it is permitted to actually house on the premises. A restriction on this type of "inventory" clearly protects the health, safety and general welfare of the public. See Kettering v. Lamar OutdoorAdvertising, Inc. (1987), 38 Ohio App.3d 16, 17, 525 N.E.2d 836.
 {¶ 22} Gem City has advanced no further arguments as to the constitutionality of the City's ordinances. "It is well-settled that courts will presume the constitutionality of a municipal ordinance and that the party challenging a legislative act of a municipality bears the burden of demonstrating its unconstitutionality." Id. Furthermore, a municipal ordinance passed under the authority of Sections 3 and 7 of Article XVIII of the Ohio Constitution, providing for the legitimate exercise of local police power, is valid if it bears a real and substantial relationship to the health, safety, morals or general welfare of the *Page 10 
public and is neither unreasonable nor arbitrary. Hudson v. Albrecht,Inc. (1984), 9 Ohio St.3d 69, 71, 9 OBR 273, 458 N.E.2d 852;Benjamin v. Columbus (1957), 167 Ohio St. 103, 4 O.O.2d 113,146 N.E.2d 854, paragraph five of the syllabus; Akron v. Chapman (1953),160 Ohio St. 382, 52 O.O. 242, 116 N.E.2d 697, paragraph one of the syllabus. "Whether such legislation bears a real and substantial relation to the public health, safety, morals or general welfare and whether it is reasonable or arbitrary are questions committed in the first instance to the judgment and determination of the legislative body, and the decisions of the legislative body on those questions will not be disturbed unless they appear to be clearly erroneous."Kettering, 38 Ohio App.3d at 17, citing Curtiss v. Cleveland (1959),170 Ohio St. 127, 10 O.O.2d 85, 163 N.E.2d 682, paragraph four of the syllabus; Pritz v. Messer (1925), 112 Ohio St. 628, 149 N.E. 30, paragraph one of the syllabus.
 {¶ 23} The City's Well Field Protection Program was designed to protect the community's potable water supply against contamination. As such, we find it to be a reasonable exercise of the City's police power, bearing a substantial relationship to the general welfare of the public. Accordingly, Gem City's first assignment of error is overruled.
 II {¶ 24} In its second assignment of error, Gem City contends that the evidence before the board of zoning appeals did not demonstrate that MVNA voluntarily abandoned its use of the 16,000 pounds of regulated substances stored within the underground storage tank simply by removing the tank and failing to report those *Page 11 
pounds in its RSAIR's.
 {¶ 25} Specifically, Gem City argues that a manifest intent to abandon a use requires affirmative proof that the use is abandoned. Therefore, evidence of mere non-use or an expressed desire to continue the use will not be sufficient to demonstrate voluntary abandonment. Gem City points out that the record does not include any documents in which owners of the property voluntarily agreed to abandon the 16,000 pounds of regulated substances once stored in the underground tanks. On the contrary, Gem City refers to the affidavit of David Persinger, the former vice president of MVNA, in which the affiant testifies that he would have included the pounds associated with the tank on the RSAIR's if he had known that exclusion of such would affect the company's TMDI. Along these same lines, Gem City further claims that the RSAIR's required owners to report actual inventory only, i.e., the amount of regulated substances maintained during the two-year reporting period, not an amount that speculatively could be maintained. Again, the conclusion Gem City makes regarding Persinger's affidavit is he was not aware that failing to report the pounds of the storage tank would result in the loss of these pounds for any future use.
 {¶ 26} Case law in the area of abandonment of nonconforming uses primarily addresses situations in which an entire use was abandoned, not a portion of a nonconforming use, as the instant matter presents. In such a case, the law concerning changes of nonconforming uses is applicable, keeping in mind that local governments may prohibit the substantial alteration of a nonconforming use in an attempt to eliminate the use or, indeed, regulate the use to the point that it withers and dies. See Beck v. *Page 12 Springfield Twp. Bd. of Zoning Appeals (1993), 88 Ohio App.3d 443, 446,624 N.E.2d 286. See, also, Ledford v. Bd. of Zoning Appeals (2007),171 Ohio App.3d 24, 2007-Ohio-1673, 869 N.E.2d 113, at ?35.
 {¶ 27} In Plas v. Carlisle Twp. Bd. of Trustees (Aug. 27, 1997), Lorain App. No. 96CA006428, 1997 WL 549666, the appellate court considered whether a change of a nonconforming use from a less restrictive to a more restrictive nonconforming use precludes future owners or occupants from resuming the less restrictive nonconforming use. There, the owner of a nonconforming service station and repair garage in a residential district ceased operation of the repair garage but continued with the service station until his health deteriorated. Id. at *1. At that point, the owner's wife removed the gasoline tanks, eliminating future use of the property as a service station. Id. Subsequent tenants operated automobile repair facilities on the property until neighbors sought a permanent injunction to enjoin this use of the property, alleging a violation of the township's zoning resolution. Id. In pertinent part, that resolution provided that "[w]henever a nonconforming use of a building or land has been changed to a more restricted use or to a conforming use, such use shall not thereafter be changed to a less restricted use." Id. at *2.
 {¶ 28} According to the Ninth District, when the original owner ceased operations of his repair garage and limited his use to a service station, he essentially changed the use of the property to a more restricted nonconforming use. Id. Once that use was terminated, the ordinance forbade future occupants from returning to a less restricted use, i.e., operation of a repair garage. *Page 13 
 {¶ 29} In the present matter, the City's Well Field Protection Program contains a similar provision restricting changes in nonconforming uses. Under RCGO 150.140.4(F)(3), "[w]henever a non-conforming use is changed to a less intensive use, such use shall not thereafter be changed to a more intensive non-conforming use." When MVNA removed the underground storage tank and proceeded to use off-site locations for fueling its delivery vehicles, it lessened the intensity of the use of regulated substances on the premises. We find that the act of removing the tank and deciding against replacing it constitutes more than mere non-use. Furthermore, such action does not simply demonstrate a decrease in business. The evidence does not suggest that MVNA lost any business by re-routing its delivery vehicles to off-site fueling stations, nor does it indicate that Gem City's business suffered from its use of synthetic oils between 1997 and 2005.
 {¶ 30} Overall, the Well Field Protection Program provides for the replacement of underground storage tanks so that nonconforming uses could retain the storage and use of their regulated substances in compliance with the ordinances. See RCGO 150.613(F). We cannot, however, interpret this provision to mean that eliminating a non-compliant underground storage tank permits the nonconforming use to simply keep the pounds associated with the tank.
 {¶ 31} Finally, we are not persuaded by Gem City's argument that David Persinger was unaware that MVNA's TMDI would not include the pounds associated with its extracted storage tank if he failed to report such pounds on the company's inventory reports. RCGO 150.3233(E) provided clear notice to property owners within *Page 14 
the overlay district that the intensity of their use of regulated substances would be determined using "the Regulated Substance Activity Inventory Report(s) submitted by an existing or proposed new use in accordance with Section 53.30, and from data collected through inspections."
 {¶ 32} Thus, we find that the trial court did not abuse its discretion in concluding that MVNA had "voluntarily abandoned" its use of the underground container, which resulted in a loss of 16,000 pounds from the property's TMDI. Accordingly, Gem City's second assignment of error is overruled.
 III {¶ 33} In its final assignment of error, Gem City contends that the City cannot incrementally retract a nonconforming use through its zoning regulations. According to Gem City, there is no partial abandonment of a nonconforming use when the area of the use has not decreased or been changed. In support of its argument, Gem City cites 2000 Ohio Atty.Gen.Ops. No 022 for the proposition that an ordinance limiting a nonconforming use on an incremental basis improperly denies the owner of the economic benefit of his or her property. It is Gem City's contention that continuing to operate lawfully as a nonconforming use upon finding that MVNA had voluntarily abandoned part of the property's nonconforming status would deny it the economically viable use of the land. For the following reasons, we find no merit to this argument.
 {¶ 34} 2000 Ohio Atty.Gen.Ops. No 022 addresses the issue of what constitutes a nonconforming use in the context of mobile homes and manufactured home parks. *Page 15 
There, the Attorney General concluded that the park as a whole constitutes the nonconforming use, not individual lots. "In the opinion of the Attorney General, while the township may have the power to examine each lot within a park on a lot-by-lot basis, exercising its authority to do so might well result in a taking, especially since the park would remain in operation but the lot would undoubtedly be useless for any other purpose, and the restriction would interfere [sic] the park owner's ability to conduct business as a whole." Meck Pearlman, Ohio Planning and Zoning Law (2007) 322, Section 7:3.
 {¶ 35} Here, limiting the property's TMDI does not interfere with the owner's ability to conduct business as a whole. Effectively, the ordinances provided an opportunity for MVNA to continue the storing, handling and using of up to 18,155 pounds of regulated substances contained in the underground storage tank by allowing it to replace its tank with one in compliance with the ordinances. See RCGO 150.613(F). Thus, MVNA could have maintained its fueling capabilities on the premises, and it would have secured this capability for future owners and occupants. However, because MVNA chose not to replace the storage tank, the City was prohibited from allowing a "substitute storage" of the regulated substances under the code. See RCGO 150.140.4(F)(3) — "Whenever a nonconforming use is changed to a less intensive use, such use shall not thereafter be changed to a more intensive non-conforming use."
 {¶ 36} We further find that the evidence does not demonstrate a denial of the economically viable use of the land. Just as MVNA adapted its business to *Page 16 
accommodate off-site fueling (reasoning that it was more economical than replacing the existing storage tank), Gem City proved that its business could maintain operations without the extra pounds by supplementing synthetic oils for regulated substances for a period of 8 years.
 {¶ 37} Accordingly, Gem City's final assignment of error is overruled.
 {¶ 38} Having overruled each of Appellant's assignments of error, the judgment of the trial court is affirmed.
 WOLFF, P.J., and DONOVAN, J., concur. *Page 1