**[Cite as *Key Ads, Inc. v. Dayton Bd. of Zoning Appeals*, 2014-Ohio-4961.]**

## IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

KEY ADS, INC.

       Plaintiff-Appellee

v.

CITY OF DAYTON BOARD OF ZONING APPEALS

       Defendant-Appellant


Appellate Case No.    26148

Trial Court Case Nos.   2013-CV-2556
                            2013-CV-2559
                            2012-CV-2604
(Civil Appeal from
 Common Pleas Court)

. . . . . . . . . . .

### O P I N I O N

Rendered on the 7th day of November, 2014.

. . . . . . . . . . .

JOHN C. CHAMBERS, Atty. Reg. No. 0029681, SASHA ALEXA M. VANDEGRIFT, Atty. Reg. No. 0080800, 33 West First Street, Suite 600, Dayton, Ohio 45402
      Attorneys for Plaintiff-Appellee

JOHN J. DANISH, Atty. Reg. No. 0046639, City of Dayton Attorney, JOHN C. MUSTO, Atty. Reg. No. 0071512, Assistant City of Dayton Attorney, 101 West Third Street, P.O. Box 22, Dayton, Ohio 45401
      Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, the City of Dayton Board of Zoning Appeals ("Board"), appeals from a judgment of the Montgomery County Court of Common Pleas reversing a decision of the Board that rejected plaintiff-appellee Key Ads, Inc.'s ("Key Ads"), applications to alter three signs by changing the face of each sign from static vinyl to electronic changeable copy panels. For the reasons outlined below, we find the common pleas court erred in reversing the Board's decision. The judgment of the common pleas court will therefore be reversed.

**Facts and Course of Proceedings**

{¶ 2} In early 2011, Key Ads filed zoning applications with the City of Dayton ("City"), requesting to alter three signs by changing the face of each sign from static vinyl panels to electronic changeable copy panels, i.e., digital panels. The three signs at issue are owned by Key Ads and are located in the City at 113 East Stewart Street, 629 South Main Street, and 3521 Riverside Drive, respectively. The Stewart Street and Main Street signs are located in the Mature General Commercial District ("MGC"), whereas the Riverside Drive sign is located in the Eclectic Single-Family Residential District ("ESF"). The signs are all static vinyl, non-digital billboards, meaning that in order to change the message on the signs, Key Ads must remove the vinyl that covers the panel of the sign and have new vinyl put in its place.

{¶ 3} All three signs at issue were built before 2006. The City adopted zoning

restrictions in 2006 that rendered the signs noncompliant with the City of Dayton Zoning Code ("Zoning Code"). However, since the signs were built before the 2006 restrictions were enacted, the signs were grandfathered in and are allowed to remain as non-conforming uses. There is no dispute that all three signs are "non-conforming off-premise signs" under the Zoning Code.[1]

{¶ 4}    On April 15, 2011, the City's Zoning Administrator, David Wombold, rejected Key Ads' applications to convert the three non-conforming off-premise signs from vinyl panels to electronic changeable copy panels. In rejecting the applications, Wombold determined that the requested alteration was not in compliance with the Zoning Code. Among the deficiencies was that the Zoning Code prohibits non-conforming signs from being renovated if the cost exceeds 50 percent of the value of the sign. Following the rejection, on May 12, 2011, Key Ads appealed to the Board, and filed a written request for a hearing and a memorandum in support of the application. The hearing took place on February 26, 2013.

{¶ 5}    At the hearing, the Board heard testimony from Nicholas Keyes, the vice president and part owner of Key Ads. Keyes testified that one of Key Ads' competitors had previously been granted permits to have electronic changeable copy signs in the same districts that Key Ads' three signs are located. Additionally, he testified that the signs' estimated

---

[1] The Zoning Code defines "non-conforming sign" as "[a] sign, lawfully existing at the time this Zoning Code, or any amendment thereto, became or becomes effective, but which fails to conform to the sign regulations of the district in which it is located[.]" City of Dayton Zoning Code 150.140.6(B). An "off-premise sign" is defined as "any sign structure displaying an establishment, merchandise, event, service, or entertainment that is not sold, produced, manufactured or furnished at the property on which the sign is located." *Id.* at 150.900.2(B). In addition, a "non-conforming off-premise sign" is "any off-premise sign not installed, constructed altered, repaired, replaced, located or relocated in accordance with 150.925.4[.]" *Id.* at 150.925.5. Section (A) of 150.925.4 provides the zoning districts in which "a person may install, construct, alter, repair, replace, locate or relocate an off-premise sign[.]" The MGC and ESF districts are not among the districts in which off-premise signs are permitted. *See Id.* at 150.925.4(A).

selling price after the conversion from vinyl to electronic changeable copy panels would be $1.1 million for the Riverside Drive sign, $2.25 million for the Main Street sign, and $2.5 million for the Stewart Street sign. According to Keyes, the cost to convert the sign panels from vinyl to electronic changeable copy would not exceed 50 percent of the signs' value.

{¶ 6} In addition to Keyes' testimony, Alan Duvall, a local certified public accountant, certified business appraiser, and attorney, testified as an expert witness at the hearing. According to Duvall, the cost to convert each sign from vinyl to electronic changeable copy panels would be $200,000 per sign. With regards to the value of the signs, Duvall opined that the fair market value of the sign must be used, not the real estate's value, nor the cost to rebuild the signs. Duvall testified that he used the highest and best use standard in evaluating the signs' fair market value. In other words, Duvall calculated the fair market value by estimating the value of the signs after their conversion from vinyl to electronic changeable copy, because, according to Duvall, that would be the highest and best use of the signs. Applying that standard, Duvall testified that the value of the Riverside Drive sign would be worth over $1 million, the Stewart Street sign would be worth approximately $2 million, and the Main Street sign would be worth over $2 million. He arrived at these valuations by considering the current revenue being generated by the vinyl signs and then multiplying it by ten, as he believed the change from vinyl to electronic changeable copy would increase the value tenfold.

{¶ 7} David Wombold, the City's Zoning Administrator, also testified at the hearing. Wombold testified that in his experience, he has never seen a vinyl sign exceed $100,000 in value, and that he estimates the highest value of a vinyl sign in the City to be

$60,000. Wombold also noted that the electronic changeable copy signs that were permitted for Key Ads' competitor were approved before he was the Zoning Administrator, and that had he been the Zoning Administrator at the time Key Ads' competitor applied, he would have denied their application as well.

{¶ 8} After the hearing, the Board deliberated and decided to affirm the Zoning Administrator's rejection of Key Ads' applications. Key Ads then appealed from the Board's decision to the Montgomery County Court of Common Pleas. The common pleas court reversed the Board's decision finding that section 150.900.18(B)(2)(b) of the Zoning Code permits the alteration of the signs' panels from vinyl to electronic changeable copy. The court also found that the alteration complies with section 150.900.18(B)(3), because the cost to alter the signs would not exceed 50 percent of the signs' value. In addition, the common pleas court found that section 150.925.14 of the Zoning Code expressly permits commercial electronic variable message signs and that replacing the signs' panels is a form of refurbishment permitted under section 150.900.15(D)(3).

{¶ 9} The Board now appeals from the judgment of the common pleas court, raising one assignment of error for review.

## Assignment of Error

{¶ 10} The Board's sole assignment of error is as follows:

THE TRIAL COURT ERRED AS A MATTER OF LAW IN INTERPRETING

THE DAYTON ZONING CODE WHEN IT FAILED TO LOOK AT THE

CODE AS A WHOLE TO DETERMINE ITS INTENT; FAILED TO APPLY

THE RULES OF INTERPRETATION CONTAINED IN THE CODE; AND APPLIED DEFAULT RULES OF STATUTORY INTERPRETATION WITHOUT FIRST DETERMINING THERE WAS ANY CONFLICT OR AMBIGUITY AMONG THE PROVISIONS.

{¶ 11} Under its single assignment of error, the Board contends the common pleas court erred in reversing its decision to reject Key Ads' application, because the court interpreted the Zoning Code incorrectly. Specifically, the Board claims that when interpreting the Zoning Code, the common pleas court failed to consider the intent of the code and applied default rules of statutory interpretation when it should have applied the rules of interpretation that are explicitly set forth within the Zoning Code.

*Standard of Review*

{¶ 12} "The standards of review for a court of common pleas and an appellate court differ considerably when an administrative appeal is involved." *Gem City Metal Spinning Co. v. Dayton Bd. of Zoning Appeals*, 2d Dist. Montgomery No. 22083, 2008-Ohio-181, ¶ 17. In the case of *In re Application for Conditional Use of Watkins*, 2d Dist. Montgomery No. 17723, 2000 WL 192430 (Feb. 18, 2000), this court confirmed that a court of common pleas must " 'determine whether there exists a preponderance of reliable, probative, and substantial evidence to support' " an agency's decision. *Id*. at *2, quoting *Dudukovich v. Lorain Metro. Hous. Auth.*, 58 Ohio St.2d 202, 207, 389 N.E.2d 1113 (1979). "Further, the [common pleas] court must presume that the agency decision is 'reasonable and valid.' " *Id*., quoting *Community Concerned Citizens, Inc. v. Union Twp. Bd. of Zoning*

*Appeals*, 66 Ohio St.3d 452, 456, 613 N.E.2d 580 (1993). "[I]n an administrative appeal pursuant to R.C. Chapter 2506, the common pleas court considers the whole record, including any new or additional evidence admitted under R.C. 2506.03, and determines whether the administrative order is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence." (Citation omitted.) *Durell v. Spring Valley Twp. Bd. of Zoning Appeals*, 2d Dist. Greene No. 2012 CA 23, 2012-Ohio-5098, ¶ 21.

{¶ 13} In contrast, when an appellate court reviews a common pleas court's decision regarding an agency order, the appellate court uses two distinct standards of review. *Lamar Outdoor Advertising v. Dayton Bd. of Zoning Appeals*, 2d Dist. Montgomery No. 18902, 2002 WL 1349600, *2 (June 21, 2002). On a question of fact, an appellate court's review is limited to an abuse of discretion. (Citation omitted.) *Id*. However, on a question of law, an appellate court's review is de novo. *Ohio Dept. of Commerce, Div. of Real Estate v. DePugh*, 129 Ohio App.3d 255, 261, 717 N.E.2d 763 (4th Dist.1998).

{¶ 14} As relevant here, the interpretation of a zoning ordinance presents a question of law that requires a de novo standard of review. (Citations omitted.) *Miamisburg v. Wood*, 137 Ohio App.3d 623, 625, 739 N.E.2d 410 (2d Dist.2000). Because the sole issue in this case is whether the Zoning Code permits Key Ads to alter its three non-conforming off-premise signs by converting the face of the signs from vinyl to electronic changeable copy panels, our review of the instant matter is de novo. Under a de novo review, we apply the same standards as the common pleas court without deference to the common pleas court's decision. *Gem City Metal Spinning Co.* at ¶ 18, citing *Brinkman v.*

*Doughty*, 140 Ohio App.3d 494, 497, 748 N.E.2d 116 (2d Dist.2000).

*Guidelines for Interpreting Zoning Ordinances*

{¶ 15}     When a zoning ordinance is unambiguous, a court needs to merely apply the law as written.  (Citation omitted.)  *WCI, Inc. v. Ohio Liquor Control Comm.*, 116 Ohio St.3d 547, 2008-Ohio-88, 880 N.E.2d 901, ¶ 11.   In such a case, there is no need to apply the rules of statutory interpretation.  *Cline v. Ohio Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 96, 573 N.E.2d 77 (1991).   "However, where a statute is found to be subject to various interpretations, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at legislative intent."   (Citations omitted.)   *Id.*

{¶ 16}     " 'Ohio law is clear that in interpreting a zoning ordinance courts must strictly construe restrictions on the use of real property in favor of the property owner.' " *Allen v. Cty. Bd. of Zoning Appeals*, 186 Ohio App.3d 196, 2010-Ohio-377, 927 N.E.2d 33, ¶ 16 (2d Dist.), quoting *BP Oil Co. v. Dayton Bd. of Zoning Appeals*, 109 Ohio App.3d 423, 432, 672 N.E.2d 256 (2d Dist.1996).   (Other citations omitted.)   "Ambiguities in zoning provisions which restrict the use of one's land must be construed against the zoning resolution because the enforcement of such a provision is an exercise [of] police power that constricts property rights."   (Citations omitted.)   *Id.* at ¶ 17.

{¶ 17}     Nevertheless, a court must give the zoning ordinance "a fair and reasonable construction with due regard for the conflicting interests involved." *Davis v. Miller*, 163 Ohio St. 91, 126 N.E.2d 49 (1955), paragraph one of the syllabus.   "An interpretation adopted should not operate to defeat the obvious intention of the legislature or

do violence to it, in whole or part." *Fostoria v. CSX RR.*, 134 Ohio App.3d 171, 173, 730 N.E.2d 475 (3d Dist.1999), citing *Harris v. Van Hoose*, 49 Ohio St.3d 24, 26, 550 N.E.2d 461, 462 (1990). (Other citation omitted). Moreover, when terms are not defined in a zoning regulation, a court should consider the common and ordinary meaning of those terms. *In re Appropriation for Hwy. Purposes of Land of Seas*, 18 Ohio St.2d 214, 249 N.E.2d 48 (1969), paragraph one of the syllabus.

*Non-Conforming Uses*

**{¶ 18}** As noted above, it is undisputed that the three signs at issue are non-conforming uses. A non-conforming use is a term "employed to designate a use of property which was lawful prior to the enactment of a zoning ordinance and which use may be continued after the effective date of the ordinance even though it does not comply with the applicable use restrictions." (Citations omitted.) *C.D.S Inc. v. Village of Gates Mills*, 26 Ohio St.3d 166, 168, 497 N.E.2d 295 (1986).

**{¶ 19}** It is well established that " 'the right to continue a non[-]conforming use is based upon the concept that one should not be deprived of a substantial investment which existed prior to the enactment of the zoning ordinance.' " *Kettering v. Lamar Outdoor Advertising*, *Inc.*, 38 Ohio App.3d 16, 18, 525 N.E.2d 836 (2d Dist.1987), quoting Young, *The Regulation and Removal of Nonconforming Uses*, 12 Western Res.L.Rev. 681, 686 (1961). However, non-conforming uses are not favorites of the law. *Id*. Thus, the rights of a non-conforming user are limited, and the clear intent and purpose is to eliminate such non-conforming uses as rapidly as possible. *Id*. at paragraph two of the syllabus.

Accordingly, "local governments may prohibit the substantial alteration of a non[-]conforming use in an attempt to eliminate the use or, indeed, regulate the use to the point that it withers and dies." (Citations omitted.) *Gem City Metal Spinning Co.*, 2d Dist. Montgomery No. 22083, 2008-Ohio-181 at ¶ 26.

*Relevant Portions of Zoning Code*

**{¶ 20}** Initially, we note that the Zoning Code has been amended since it took effect in 2006. Accordingly, the version of the Zoning Code in effect at the time Key Ads filed its 2011 application applies to this matter. As noted earlier, the specific issue in dispute here is whether the Zoning Code permits Key Ads to alter its three non-conforming off-premise signs by converting the face of the signs from vinyl to electronic changeable copy panels.

**{¶ 21}** To that end, the Board contends that section 150.140.4(B)(1) of the Zoning Code governs alterations and improvements to non-conforming signs. This provision states the following:

**Section 150.140.4   Non-Conforming Use of Buildings and Land**

A non-conforming use may continue so long as it remains otherwise lawful and does not constitute a public nuisance, subject to the following provisions:

* * *

(B) Alteration or Reconstruction of a Building Occupied by a Non-Conforming Use.

(1)   No building or structure occupied by a non-conforming use shall be

improved or reconstructed except when the use is changed to a use permitted in the district in which it is located or upon prior approval of the Board of Zoning Appeals, and then only if the cumulative cost of the alteration, reconstruction, or improvement does not exceed 50% of the building's replacement value.

{¶ 22}     On the other hand, Key Ads contends that sections 150.900.18(B)(2)(b) and (B)(3) govern the alteration of non-conforming signs.   These sections state the following:

**Section 150.900.18   Regulations for Non-conforming Signs**

* * *

 (B)   <u>Alteration and Removal of Non-Conforming Signs</u>.

   (2) A non-conforming sign shall not be altered, modified or   reconstructed other than to comply with this Section except that:

   * * *

      (b) An existing sign pursuant to this sub-section may be changed by replacing a sign panel or by repainting a sign face only.   Such alterations shall not require changes to the structure, framing or erection or relocation of the sign unless such changes conform to this Section.

   (3)   Subject to the provisions of this Section, non-conforming signs may be repaired and renovated so long as the cost of such work does not exceed within any twelve (12) month period fifty (50) percent of the value of such

sign.

**{¶ 23}**      Upon reviewing sections 150.140.4(B) and 150.900.18(B), we find that these are comparable ordinances that both apply to the alteration and improvement of non-conforming signs.      Section 150.900.18(B) establishes when the alteration of non-conforming signs is permitted and section 150.140.4(B) establishes when "buildings" and "structures" with non-conforming uses may be improved or altered.   The definition of the term "building" includes the term "structure," and the definition of "structure" includes "signs" and vice versa.   *See* City of Dayton Zoning Code 150.200.1(B); 150.200.2(B)(229); 150.900.2(F). [2]   Accordingly, section 150.140.4(B)(1) applies to non-conforming signs, despite the absence of the term "sign" in the provision.

**{¶ 24}**      Furthermore, while the Zoning Code does not define the word "improve," its ordinary meaning is "[t]o increase the value or enhance the appearance of something." *Black's Law Dictionary* (9th Ed.2009).   Here, expert witness Alan Duvall specifically testified the conversion from vinyl to electronic changeable copy panels would increase the signs' value tenfold.   Additionally, the conversion would undoubtedly enhance the signs' appearance, as the messages would be displayed through a more sophisticated, electronic medium.   Therefore, we find that the conversion from vinyl to electronic changeable copy sign panels qualifies as an improvement under section 150.140.4(B)(1).

**{¶ 25}**      When confronted with such comparable provisions as 150.140.4(B)(1) and 150.900.18(B), the Zoning Code requires the most restrictive provision to govern.

---

[2]   The definitions of "building" and "structure" in sections 150.200.1(B) and 150.200.2(B)(229) are cited from the current version of the Zoning Code because the Board has cited them as applicable and Key Ads has not questioned their accuracy nor brought any differences with the 2011 version of section 150.200 to our attention.

Specifically, section 150.100.5(B) of the Zoning Code states that "[w]here the conditions imposed by any provision of this Zoning Code upon the use of land, buildings, or structures are either more restrictive or less restrictive than comparable conditions imposed by any other provision of this Zoning Code; or of any other law, ordinance, resolution, rule or regulations of any kind, the regulations that are more restrictive shall govern."  In addition, section 150.100.5(C) of the Zoning Code provides that "[i]f the provisions of the Zoning Code are inconsistent with one another, the more restrictive provision shall control."  The foregoing interpretation guidelines within the Zoning Code are unambiguous; therefore, we will apply them as written.  *See WCI, Inc.*, 116 Ohio St.3d 547, 2008-Ohio-88, 880 N.E.2d 901 at ¶ 11.

{¶ 26}    That said, we must determine if section 150.140.4(B)(1) or sections 150.900.18(B)(2)(b) and (B)(3) are more restrictive, and then apply the more restrictive provision to the instant case.  As noted above, section 150.140.4(B)(1) permits Key Ads to improve or alter non-conforming signs only if the use is changed to a use that is permitted in the district in which it is located, or if the Board otherwise approves of the improvement or alteration and its cumulative cost does not exceed 50 percent of the "replacement value" for the sign.

{¶ 27}    Initially, we note that the conversion from vinyl to electronic changeable copy panels would not make the signs a permitted use, as they would remain off-premise signs and off-premise signs are not permitted in the MGC and ESF districts.  *See* City of Dayton Zoning Code 150.925.4.  Also, the Board did not approve of the conversion, and even if did, the cost of the improvement cannot exceed 50 percent of the signs' "replacement value."

**{¶ 28}** The phrase "replacement value" is not defined by the Zoning Code; therefore, we must use its ordinary meaning. *See In re Appropriation for Hwy. Purposes of Land of Seas*, 18 Ohio St.2d 214, 249 N.E.2d 48 at paragraph one of the syllabus. The ordinary meaning of "replace" is to "restore to a former place, position, or condition." *Webster's Third New International Dictionary* 1925 (1993). In addition, the ordinary meaning of "value" is "the monetary worth of something." *Id*. at 2531. Similarly, the definition of "replacement cost" is "the cost of a substitute asset that is equivalent to an asset currently held." *Black's Law Dictionary* (9th Ed.2009).

**{¶ 29}** In *Lamar Outdoor Advertising, Inc*., 38 Ohio App.3d 16, 525 N.E.2d 836, we stated that "the appraised value or replacement value seems more nearly to approximate the worth of the structure, undamaged." *Id*. at 19, citing 1 Anderson, American Law of Zoning, 2d (1976) 492, Section 6.59; Annotation (1974), 57 A.L.R.3d 419, at 449-468. Also, the Supreme Court of Iowa has held that " 'replacement cost' means simply the amount of money it would cost to replace the structure by restoring it to its former state of existence or condition." *Incorporated City of Denison v. Clabaugh*, 306 N.W.2d 748, 752 (Iowa 1981). Based on the foregoing, we conclude that the ordinary meaning of "replacement value" would be the cost to replace something in an equivalent condition.

**{¶ 30}** In applying this definition of "replacement value," section 150.140.4(B)(1) establishes that improvements and alterations to Key Ads' signs cannot exceed 50 percent of the cost to replace the vinyl signs in their current condition. The record indicates that in their current condition, the vinyl signs are each worth somewhere between $60,000 and $100,000. The $1 million to $2.5 million values testified to by Key Ads' vice

president and expert Alan Duvall are clearly inapplicable, as they represent the fair market value of the signs after the conversion to electronic changeable copy panels. Given that the conversion from vinyl to electronic changeable copy panels will cost $200,000, it is apparent that the project would exceed 50 percent of the signs' $60,000 to $100,000 replacement value. Therefore, under section 150.140.4(B)(1), the conversion would not be permitted.

{¶ 31}    In contrast, sections 150.900.18(B)(2)(b) and (B)(3) are less restrictive in that they permit non-conforming signs to be altered by replacing a sign panel if the sign's structure is not changed and the cost of the work does not exceed 50 percent of the "value" of the sign. The term "value" is not defined in the Zoning Code, and it is without a modifier; therefore, its meaning is very broad and could arguably encompass fair market value. Given this ambiguity, we must turn to the rules of statutory construction and interpret "value" in the light most favorable to Key Ads. In that instance, the value of the signs would be interpreted as the highest and best fair market value, which Keyes and Duvall testified would be between $1 million and $2.5 million. Thus, under section 150.900.18(B)(2)(b) and (B)(3), the $200,000 cost to replace the panels would not exceed 50 percent of the signs' value and permit the conversion from vinyl to electronic changeable copy   panels.

{¶ 32}    Because sections 150.900.18(B)(2)(b) and (B)(3) are less restrictive, they would not govern over section 150.140.4(B)(1). *See* City of Dayton Zoning Code 150.100.5(B). Accordingly, we agree with the Board and find that section 150.140.4(B)(1) applies and prohibits Key Ads from changing the face of its signs from vinyl to electronic changeable copy panels. This conclusion is in line with the well-established legislative intent to restrict non-conforming uses and to eliminate them as rapidly as possible. *See*

*Lamar Outdoor Advertising, Inc.*, 38 Ohio App.3d at 18, 525 N.E.2d 836; *Gem City Metal Spinning Co.*, 2d Dist. Montgomery No. 22083, 2008-Ohio-181 at ¶ 26.

**{¶ 33}** Keeping the foregoing holding in mind, we shall next address Key Ads' additional arguments under the Zoning Code. Specifically, Key Ads contends that when read together, sections 150.925.5 and 150.925.14(B) permit non-conforming electronic variable message signs. These sections state as follows:

**Section 150.925.5   Non-Conforming Off-Premise Signs**

Any off-premise sign not installed, constructed, altered, repaired, replaced, located or relocated in accordance with 150.925.4 is a non-conforming off-premise sign and shall be repaired, relocated or replaced in accordance with 150.925.6 through 150.925.14 or removed in accordance with 150.900.18.

**Section 150.925.14    Lighting of Off-Premise Signs**

Off-premise signs may be illuminated subject to the following regulations:

   * * *

(B) Electronic variable message signs giving public information such as, but not limited to, time, date temperature, weather, or other similar information, and commercial electric variable-message signs are permitted, provided such signs do not interfere with traffic safety, and do not resemble or simulate traffic control or safety devices or signs.

**{¶ 34}** As can be seen, neither section 150.925.5 nor section 150.925.14(B) expressly refer to the alteration or improvement of non-conforming off-premise signs. Rather, section 150.925.5 instructs what Zoning Code provisions to follow when repairing,

relocating or replacing non-conforming off-premise signs. Of those provisions, section 150.925.14(B) provides that electric variable-message signs are permitted if they meet certain traffic safety requirements. Even if we were to accept Key Ads' contention that these provisions expressly permit non-conforming off-premise electronic changeable copy signs, they would be inconsistent with the regulation in section 150.140.4(B)(1), which we already concluded prohibits Key Ads from converting its signs from vinyl to electronic changeable copy panels. When provisions of an ordinance are inconsistent, the more restrictive provision governs. City of Dayton Zoning Code 150.100.5(C). Therefore, section 150.140.4(B)(1) would govern as the more restrictive provision.

{¶ 35} Key Ads also argues the conversion from vinyl to electronic changeable copy panels qualifies as maintenance under section 150.900.15(D)(3) of the Zoning Code and claims that this section does not require a permit for maintenance. Section 150.900.15(D)(3) states as follows:

(D) Maintenance. All signs shall be maintained in accordance with the following:

* * *

(3) Whenever any sign, either conforming or non-conforming to these regulations, is required to be removed for the purpose of repairing, refurbishing or repainting, the same may be done without a permit or any payment of fees provided that all of the following conditions are met:

(a) There shall be no alteration, remodeling to the sign base, sign supports(s) of the mounting of the sign itself.

(b) There shall be no enlargement or increase in any of the dimensions of the sign or its structure.

(c) The sign shall be accessory to a legally permitted, conditional or non-conforming use.

**{¶ 36}** The Zoning Code does not define the terms "maintenance" or "refurbish"; therefore, we look to the ordinary meaning of these terms. *See In re Appropriation for Hwy. Purposes of Land of Seas*, 18 Ohio St.2d 214, 249 N.E.2d 48 at paragraph one of the syllabus. The ordinary meaning of "maintenance" is "the care and work put into property to keep it operating and productive; general repair and upkeep." *Black's Law Dictionary* (9th Ed.2009). The ordinary meaning of "refurbish" is "to brighten or freshen-up: to make as if new." *Webster's Third New International Dictionary* 1910 (1993). Here, changing the sign panels from vinyl to electronic changeable copy would arguably brighten or freshen-up the signs. However, the record does not indicate that such refurbishment is required as maintenance, as the signs are currently functional and in good condition. Furthermore, we have already determined that the conversion from vinyl to electronic changeable copy qualifies as an improvement. Regardless, even if we were to find that the term "refurbish" encompassed the conversion from vinyl to electronic changeable copy sign panels and that the refurbishment satisfied all the requirements in (D)(3)(a) through(c), this provision would be inconsistent with section 150.140.4(B)(1) and the more restrictive provision would govern. *See* City of Dayton Zoning Code 150.100.5(C). Section 150.140.4(B)(1) is more restrictive in that it prohibits the conversion from vinyl to electronic changeable copy panels; therefore it would govern over 150.900.15(D)(3).

{¶ 37}     For the foregoing reasons, we conclude that the Board's decision affirming the rejection of Key Ads' application to change the face of its signs from static vinyl panels to electronic changeable copy panels was lawful under the Zoning Code.  As noted earlier, section 150.140.4(B)(1) applies to this matter and only permits improvements and alterations to structures with non-conforming uses when the Board approves of the improvement or alteration and its cumulative cost does not exceed 50 percent of the structure's replacement value.  In this case, the Board disapproves and the $200,000 per-sign cost to convert each sign from vinyl to electronic changeable copy panels exceeds the signs' $60,000 to $100,000 replacement value.  Accordingly, the conversion is prohibited by the Zoning Code and this conclusion is in line with the well-established legislative intent to restrict non-conforming uses.

{¶ 38}     The Board's sole assignment of error is sustained.


**Conclusion**

{¶ 39}     Having sustained the Board's sole assignment of error, the judgment of the common pleas court is reversed.


. . . . . . . . . . . .

HALL, J., concurs.

DONOVAN, J., dissenting:

{¶ 40}     I disagree.  The linchpin of the majority's opinion is a conclusion on a finding of fact, which we review under an abuse of discretion standard.  Nevertheless, the

majority finds that based upon the testimony of David Wombold, the City's Zoning Administrator, "he has never seen a vinyl sign exceed $100,000 and that he estimates the highest value of a vinyl sign to be $60,000." Thus, according to the majority, the Board correctly found that the improvement or alteration exceeds 50% of the structure's replacement value and the conversion is prohibited by 150.140.4(B)(1). The difficulty with this conclusion is David Wombold did not testify under oath regarding value. No foundation was laid for Wombold's opinion or expertise, if any, and his statements were given after the evidentiary portion of the administrative hearing had concluded. Furthermore, the trial court was entitled to credit the testimony of Key's expert, Duvall and Mr. Keyes on this issue.

{¶ 41} Furthermore, value is not defined anywhere in the Zoning Code. The City failed to give Key Ads notice as to how to value the sign for non-conforming use purposes. Accordingly, the ordinances should be strictly construed against the City.

{¶ 42} Additionally, given the ambiguities in the ordinances, the fact that they should be read in pari material and construed liberally in favor of Key Ads, I would find the specific ordinances regarding electronic signs are not governed by the general. Non-conforming electronic changeable copy signs are expressly allowed by 150.925.14(B). Furthermore, nothing in the Zoning Code specifically defines electronic changeable copy signs as an expansion of the non-conforming use of an off-premise advertising sign. I would affirm.

. . . . . . . . . .

Copies mailed to:

John C. Chambers
Sasha Alexa M. VanDeGrift

John J. Danish
John C. Musto
Hon. Mary Katherine Huffman