[Cite as *Powlette v. Dayton Bd. of Bldg. Appeals*, 2020-Ohio-5357.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| DARREN POWLETTE | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28666 |
| | : | |
| v. | : | Trial Court Case No. 2018-CV-5412 |
| | : | |
| BOARD OF BUILDING APPEALS | : | (Civil Appeal from |
| CITY OF DAYTON, et al. | : | Common Pleas Court) |
| | : | |
| Defendant-Appellee | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of November, 2020.

. . . . . . . . . . .

GREGORY S. PAGE, Atty. Reg. No. 0065264, 7501 Paragon Road, Lower Level, Dayton, Ohio 45459
    Attorney for Plaintiff-Appellant


MATHIAS H. HECK, JR., by NATHANIEL S. PETERSON, Atty. Reg. No. 0095312, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, P.O. Box 972, Dayton, Ohio 45422
    Attorney for Defendant-Appellee


. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Darren Powlette appeals from a judgment of the Montgomery County Court of Common Pleas, which affirmed an adjudication order of the Board of Building Appeals ("BBA"). The adjudication order upheld the Montgomery County Building Regulation Division's ("MCBRD") stop work order addressed to a barn on Powlette's property. We affirm the judgment of the trial court.

{¶ 2} On November 20, 2018, Powlette filed a notice of administrative appeal in the court of common pleas, attached to which was a copy of the June 25, 2018 stop work order issued to Powlette (Adjudication Order No: AO18-003) by the MCBRD. The stop work order cited a project entitled "Wedding Barn at Stoney Hill Bed and Breakfast," located at 7757 Upper Miamisburg Road. The stop work order stated: "According to our investigation, you have constructed a barn without any permits or inspections, and are using it as a wedding chapel, which is a place of public assembly, and is regulated by the Ohio Building Code." Citing R.C. 3781.11, the stop work order listed the following issues of non-compliance: 1) constructing a barn for use as a wedding chapel without first obtaining approval; 2) failing to submit any construction documents for review or approval "for this building or this use"; 3) constructing the building without any inspections or inspection approval; and 4) using the building for wedding events without a Certificate of Occupancy, "which puts many lives at risk, both from a structural and fire safety perspective."

{¶ 3} The stop work order listed the following required actions: 1) apply for approval for the construction of and use of the building; 2) submit construction documents for review which bear the seal of a registered design professional and contain all information necessary to ascertain building code compliance; 3) have all work inspected,

including any work covered up without inspection; 4) cease use of the building until all code requirements have been met and a certificate of occupancy has been issued.

{¶ 4} A copy of the BBA's October 26, 2018 decision was also attached to the notice of administrative appeal. The decision stated:

Number one, the structure at issue is being used for both agricultural and for public assembly occupancy purposes for weddings, wedding receptions, and similar activities.

Item number two, assembly occupancies such as those are specifically regulated under the Ohio Building Code with respect to sanitation, fire safety, and life safety.

Number three, the structure was constructed without first obtaining approval for an assembly occupancy by the Montgomery County Building Regulations Division.

Number four, the chief building official of Montgomery County has issued an adjudication order AO18-003 citing the unapproved assembly occupancy as a "public nuisance" as defined in ORC 3781.11 in accordance with his authority under the Ohio Revised Code.

Number five, the chief building official has cited as the basis of his determination the failure of the applicant to comply with the standards applicable to assembly occupancies as defined in ORC 3781.06(A)(1).

Number six, the appellant has failed to demonstrate to the Board that the assembly use of the structure does not constitute a public nuisance.

Number seven, accordingly, it is the opinion of the Board that the appellant's

request for relief from adjudication Order AO18-003 be denied.

For these reasons, the BBA "denied' Powlette's appeal.

{¶ 5} Powlette filed his brief in the trial court on April 8, 2019. In the brief, he asserted that he acquired the 26-acre property at issue in May 2016. He asserted that, since 2003, the property had been used to grow hay, producing 900 bales per year, and hay production had "always been at the forefront" of his farming activities; he also raised turkeys, chickens, and alpacas in the barn on the property. Powlette stated that, given the agricultural use of the property, he secured an agricultural exemption from Miami Township for the barn he was constructing on the property in 2017. Specifically, Powlette asserted that he filed a "Declaration of Intent – Agricultural Exemption" with Miami Township in October 2017, and that the "agricultural exemption exempts the barn from the Ohio Building Code."

{¶ 6} Powlette asserted that, before constructing the barn and contemporaneous with his filing of the Declaration of Intent in October 2017, he provided Miami Township with complete drawings and a site plan for his project. He stated that the drawing were provided by Judge Engineering and that the Township "admitted that it received the site plan." According to Powlette, the drawings were stamped "Zoning Approved" on October 5, 2017 by the Community Development Department of Miami Township, and this "completed the Property's agricultural exemption."

{¶ 7} Powlette asserted that he submitted an additional Declaration of Intent-Agricultural Exemption on July 6, 2018; in that declaration, he added agritourism to the proposed uses of the barn. According to Powlette, he also submitted an application to obtain a current agricultural use valuation (CAUV) by the Montgomery County Auditor.

According to Powlette, the Auditor had approved his CAUV for as long as he had owned the property, and it was "wholly apparent" that the property was being used for agricultural purposes "and furthermore that the subject barn has an agricultural exemption." He asserted that, under either of these circumstances, his barn was exempt from the Ohio Building Code. According to Powlette, the MCBRD issued a stop work order nearly a year after the barn was finished.

{¶ 8} Powlette argued in the trial court that the BBA wrongly upheld the stop work order for two reasons, namely that the structure at issue retained the benefits of an agricultural use exemption pursuant to R.C. 3781.061 and Miami Township Ordinance 307, and the barn was used for agricultural purposes and was therefore exempt from the Ohio Building Code pursuant to R.C. 3781.06(B)(1).

{¶ 9} According to Powlette, the BBA relied on "unsubstantiated, public comment" in arriving at its decision, rather than "relevant, substantive testimony." Specifically, he argues that the BBA permitted "an angry neighbor to 'testify' though none of his testimony made a question of law or fact more or less probable." Powlette also stated that he had been repeatedly advised by MCBRD employees that his barn would not be inspected due to the agricultural exemption. He asserted that MCBRD and BBA should be "estopped from issuing and then enforcing" the stop work order.

{¶ 10} On April 10, 2019, the BBA filed a motion seeking to be dismissed from the administrative appeal, because it was the MCBRD that had sought to enforce the order. Powlette opposed the motion and sought, in the alternative, to substitute the proper party or amend his notice of appeal. The court overruled the motion to dismiss on May 16, 2019. It determined that the BBA was not the proper party in this action, but that it could

have informed Powlette or the court of this fact "at a much earlier date than six months after the filing" of the appeal; the court permitted Powlette to add MCBRD as a necessary party. Powlette filed an amended notice of administrative appeal on May 16, 2019.

{¶ 11} MCBRD filed a brief on June 28, 2019. It asserted that Maury Wyckoff, the Chief Building Official for MCBRD, had testified that the stop work order was issued because the barn failed to comply with the Ohio Building Code, and that Wyckoff also testified that the Miami Township Zoning Department had issued a zoning violation to Powlette "due to business use on an agriculturally zoned property." According to Wyckoff, the zoning violation had been upheld by the Miami Township Board of Zoning Appeals ("BZA"). According to MCBRD, the decision of the BZA had been affirmed by the court of common pleas.

{¶ 12} MCBRD further asserted that Alex Carlson, an employee of the Miami Township Zoning Department, testified that weddings are not related to agritourism and therefore are not "agriculturally exempt," and that the barn was a "building for public assembly" and therefore was regulated by the Ohio Building Code. MCBRD argued that Powlette had represented the structure as a "wedding barn" and the property as "Stoney Hill Bed and Breakfast" on a website that he maintained.

{¶ 13} MCBRD further asserted that the Miami Valley Fire District had issued a citation to Powlette (Order #2018-0001), which listed 21 violations of the Ohio Administrative Code (also known as the Ohio Fire Code). According to MCBRD, the State Board of Building Appeals affirmed the citation.

{¶ 14} MCBRD asserted that the BBA had correctly determined that 1) the structure at issue was being used both for agricultural purposes and for public assembly

purposes, such as weddings and wedding receptions, and 2) structures for "assembly occupancies" such this one were specifically regulated under the Ohio Building Code "with respect to sanitation, fire safety, and life safety," and 3) the structure at issue was constructed without first obtaining approval for assembly occupancy by MCBRD.

{¶ 15} MCBRD characterized the issue presented as, "[i]n many regards, * * * a case of first impression," because it was unclear in the case law "whether a structure used for both agriculture and non-agriculture purposes is wholly and entirely exempt from regulation by the [Ohio Building Code] as a result of the use for agricultural purpose." However, it noted that the BBA, the Miami Township Zoning Department, and the Montgomery County Court of Common Pleas had all found that Powlette's assembly use of the structure was not exempted under the law, and thus not free from appropriate and necessary regulation.

{¶ 16} MCBRD further noted that Powlette cited to no statute or case law "regarding estoppel of a county, state, or municipal, building department from enforcing its duties under the Ohio Revised Code" based on an owner's representation that the structure at issue was used only for agricultural purposes and thus was agriculturally exempt. In addition to Powlette's misrepresentation regarding the use of the barn, MCBRD asserted that he failed to follow the proper building procedures, which allowed MCBRD to inspect the structure.

{¶ 17} MCBRD attached to its brief the May 30, 2019 judgment of the Montgomery County Court of Common Pleas in Montgomery C.P. No. 2018-CV-4129 (Exhibit BB); that judgment affirmed an August 6, 2018 decision of the BZA, which found violations of Zoning Resolution 801 relating to Powlette's barn. The judgment noted that, prior to the

notice of violation, Powlette's agricultural exemption was based upon the proposed use of the barn for "viticulture, storing of agricultural products." The judgment noted that the BZA's argument was that, at the time of the violation, "the barn did not house any livestock, there was no viticulture or the selling of wine or the storage of agricultural products and Powlette had entered into contract(s) to rent the barn for a wedding venue and was advertising the barn as being available to rent for weddings." The judgment affirmed the BZA's May 8, 2018 decision of that Powlette's use of the barn did not constitute agritourism. The court declined to "make an advisory opinion" about whether a barn's use as a wedding venue would constitute agritourism if the owner were also housing animals, hay, and/or farm equipment in the barn at the time of the wedding.

{¶ 18} MCBRD also attached to its brief the January 2, 2019 citation from the Miami Valley Fire District, which was directed to "Stoney Hill Rustic Weddings, LLC" and Powlette (Exhibit CC). The citation stated that Robert Pugh, a Certified Fire Safety Inspector, inspected Powlette's barn on October 29, 2018 and found reason to believe that the barn violated the part of the Ohio Administrative Code known as the Ohio Fire Code. As discussed above, the citation listed 21 violations, and it ordered Powlette to take 21 corrective actions within 30 days to abate the violations. For example, the first violation was set forth as follows:

> 1. * * * The responsible person(s) have occupied or permitted the structures at the site to be occupied while the structures constitute a serious hazard to the public and responsible persons. The structures have been altered, repaired and/or constructed in violation of the Ohio Building and Ohio Fire Codes in a manner that constitutes an unapproved or

impermissible change of use under the Ohio Building Code and Ohio Fire Code. These changes to structures have occurred in a manner that constitutes a distinct or serious fire hazard to occupants, including persons attending weddings, wedding receptions and other parties therein. As described more fully in (2-21) of this citation, the structures either do not have or the responsible persons have not properly maintained essential fire protection system features, including fire alarms systems, fire department notification systems, fire suppression systems, fire pumps and water supplies, emergency lighting, fire extinguishers and/or egress markings for the actual occupancy types occurring in the structures. The structures have grossly and/or unsafe electrical systems, HVAC systems, egress provisions and/or business operations for the actual occupancy types occurring in the structure. The structure has been constructed without the approval of the building code official having jurisdiction. The facility was built without permits, inspection or approval of the building code official having jurisdiction.

A civil penalty of $1,000.00 was assessed for each violation.

{¶ 19} Exhibit CC also included a final order from the State Board of Building Appeals related to the Fire District's citation, which upheld all 21 items of the citation and assessed a "civil penalty of $21,000 per month starting 180 days after the date of this hearing and continuing until all items are abated." Finally, Exhibit CC contained Powlette's notice of administrative appeal from the State Board of Building Appeals' final order. The court's docket reflects that Powlette dismissed his appeal without prejudice

on April 7, 2020.

{¶ 20} In reply, Powlette asserted that the barn had "**always** been used for agricultural purposes," and that no courts have determined that "weddings held in barns do NOT constitute agritourism. * * * As such, the converse must be true * * *. That is to say, weddings held in barns are agritourism."   Powlette argued that Miami Township had never revoked or modified the exemption certificate it issued to him.   He argued that the "officials charged with the responsibility of enforcing the building code constantly refused to inspect [his] barn" and "told him his barn was exempt from the building code because he had an exemption certificate."   Finally, Powlette asserted that "the acts and conduct of Montgomery County" clearly demonstrated that it had no authority to inspect the barn and no interest in inspecting the barn because it was an exempt structure, that he relied on the County's acts and conduct to his detriment, and that this was "a quintessential case of waiver by estoppel."

{¶ 21} On July 11, 2019, Powlette filed a motion to strike the exhibits attached to MCBRD's brief; MCBRD opposed the motion on the same day.   On August 16, 2019, the trial judge to whom the case had been assigned filed a request for disqualification, noting that the judge's staff attorney had represented a party adverse to Powlette in another administrative appeal prior to her employment with the court.   On September 18, 2019, the matter was transferred to a different judge.

{¶ 22} On December 4, 2019, the trial court affirmed the MCBRD's decision,[1] and

---

[1] The trial court also found that MCBRD was the proper party to enforce building regulations, and it dismissed the BBA as a party to the appeal.

it denied Powlette's motion to strike MCBRD's exhibits, citing R.C. 3781.031.[2]   After summarizing the parties' arguments, the court determined as follows:

> Upon review of the certified record, the briefs of the parties, and the other documents referenced herein, the Court finds there is a preponderance of the evidence that supports the reasonableness and lawfulness of the BBA's adjudication order upholding [MCBRD's] stop work order.   The Court finds that the evidence in the record that was before the BBA is reliable, probative, and substantial and the adjudication order is in accordance with law.   Therefore, the Decision of the [BBA] is AFFIRMED.

{¶ 23} On appeal from the trial court's affirmance of the administrative decision, Powlette asserts two assignments of error.   His first assignment of error states:

> THE TRIAL COURT'S DETERMINATION THAT THE STRUCTURE ON APPELLANT'S PROPERTY DID NOT RETAIN AN AGRICULTURAL EXEMPTION IS CONTRARY TO LAW AND AN ABUSE OF DISCRETION.

{¶ 24} As argued below, Powlette asserts that the structure on his property "retain[ed] the benefits of an agricultural exemption pursuant to [R.C.] 3781.061 and Miami Township Ordinance 307," was used for agricultural purposes, and therefore retained the benefits of an agricultural exemption pursuant to R.C. 3781.06(B)(1).   He argues that, if the structure has an agricultural exemption, the stop work order had no merit and "must be set aside or rescinded."

{¶ 25} Powlette cites *Griffith v. Rielage*, 127 Ohio Misc.2d 122, 2004-Ohio-1443,

---

[2] R.C. 3781.031(D) states: " * * * The court shall not be confined to the record as certified to it by the agency but any party may produce additional evidence and the court shall hear the matter upon the record and additional evidence any party introduces. * * *."

806 N.E.2d 621 (C.P.).  In that case, the owners of an equestrian center brought an administrative appeal from a decision of the Ohio Board of Building Appeals, which upheld orders and citations of remediation issued by an inspector from the Fire Marshal's Office relating to inadequate fire protection and unsafe means of egress for apartments in the horse barn.  The Franklin County Court of Common Pleas determined that the record contained ample evidence that the occupants of appellants' barn were "placed at unreasonable risk due to the lack of fire warning devices and the lack of adequate means of emergency egress."  *Id*. at ¶ 17.  The court determined, however, that the order was not "in full accordance with law."  "Most notably," the order dictated that the owners take remediation measures in accordance with the Ohio Building Code, but as the owners correctly point out, the zoning inspector "certified that appellants' barn was used in agriculture." *Id*. at ¶ 36. Thus, the court found that "the provisions of R.C. 3781.061 become operative."  The court concluded:

> Considering that the board's remediation or abatement order includes overt and specific adherence to the Ohio Basic Building Code, it is overly broad inasmuch as appellants' property is not subject to regulation promulgated under the authority of the statutes referenced immediately above. Accordingly, the board's October 31, 2003 order and the remediation order incorporated therein are *modified* to the extent that appellants cannot be compelled to adhere to R.C. 3781.06 to 3781.20 or 3791.04 and regulations promulgated under R.C. 3781.06 to 3781.20 or 3791.04. Regulations having as their genesis other Revised Code sections may, however, be the source of regulatory effect.  Similarly, appellee may use

any other of its statutory granted authority to effect hazard abatement herein.

(Emphasis sic.) *Id.* at ¶ 37. Powlette asserts that, similarly, since his property received an agricultural exemption, the MCBRD lacked authority to issue the stop work order pursuant to the Ohio Building Code.

{¶ 26} Powlette further asserts that he "is using the structure in a manner that is incident to an agricultural use of the land on which the structure is located," and that he "uses the barn for hay storage throughout the year." According to Powlette, the structure is also used for poultry husbandry and houses alpacas.

{¶ 27} The MCBRD responds that "public assembly occupancies" are regulated under the Ohio Building Code, "particularly with respect to sanitation, fire safety, and life safety concerns," and therefore the record supported the BBA's finding that the structure on Powlette's property had to adhere to the Ohio Building Code and thus, by extension, to the stop work order. According to MCBRD, the evidence established that the structure at issue was not being used exclusively for agriculture, but for public assembly purposes as well, and "[t]his multi-purpose use does not grant complete exemption" from the Ohio Building Code. The MCBRD directs our attention to Exhibit BB of its brief, the common pleas court decision in the case which found violations of Zoning Resolution 801 relating to Powlette's barn.

{¶ 28} This Court has previously noted:

"The standards of review for a court of common pleas and an appellate court differ considerably when an administrative appeal is involved." *Gem City Metal Spinning Co. v. Dayton Bd. of Zoning Appeals,*

2d Dist. Montgomery No. 22083, 2008-Ohio-181, ¶ 17. In the case of *In re Application for Conditional Use of Watkins*, 2d Dist. Montgomery No. 17723, 2000 WL 192430 (Feb. 18, 2000), this court confirmed that a court of common pleas must " 'determine whether there exists a preponderance of reliable, probative, and substantial evidence to support' " an agency's decision. *Id.*at *2, quoting *Dudukovich v. Lorain Metro Hous. Auth.*, 58 Ohio St.2d 202, 207, 389 N.E.2d 1113 (1979). "Further, the [common pleas] court must presume that the agency decision is 'reasonable and valid.' " *Id.*, quoting *Community Concerned Citizens, Inc. v. Union Twp. Bd. of Zoning Appeals,* 66 Ohio St.3d 452, 456, 613 N.E.2d 580 (1993). "[I]n an administrative appeal pursuant to R.C. Chapter 2506, the common pleas court considers the whole record, including any new or additional evidence admitted under R.C. 2506.03, and determines whether the administrative order is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence." (Citation omitted.) *Durrell v. Spring Valley Twp. Bd. of Zoning Appeals*, 2d Dist. Greene No. 2012 CA 23, 2012-Ohio-5098, ¶ 21.

In contrast, when an appellate court reviews a common pleas court's decision regarding an agency order, the appellate court uses two distinct standards of review. *Lamar Outdoor Advertising v. Dayton Bd. of Zoning Appeals,* 2d Dist. Montgomery No. 18902, 2002 WL 1349600, *2 (June 21, 2002). On a question of fact, an appellate court's review is limited to an abuse of discretion. * * * *Id.* However, on a question of law, an appellate

court's review is de novo. *Ohio Dept. of Commerce, Div. of Real Estate v. DePugh*, 129 Ohio App.3d 255, 261, 717 N.E.2d 763 (4th Dist.1998). *Key Ads v. Dayton Bd. of Zoning Appeals*, 2014-Ohio-4961, 23 N.E.3d 266, ¶ 12-13 (2d Dist.).

**{¶ 29}** R.C. 3781.06(B) states:

Sections 3781.06 to 3781.18, 3781.40, and 3791.04 of the Revised Code do not apply to either of the following:

(1) Buildings or structures that are incident to the use for agricultural purposes of the land on which the buildings or structures are located, provided those buildings or structures are not used in the business of retail trade. * * *

**{¶ 30}** R.C. 3781.061 states:

Whenever a county zoning inspector under section 303.16 of the Revised Code, or a township zoning inspector under section 519.16 of the Revised Code, issues a zoning certificate that declares a specific building or structure is to be used in agriculture, such building is not subject to sections 3781.06 to 3781.20, 3781.40, or 3791.04 of the Revised Code.

**{¶ 31}** We note that, in Case No. 2018-CV-4129, wherein the common pleas court affirmed violations of Miami Township Zoning Resolution 801 relating to Powlette's barn, the court recognized, as the BZA had, that Zoning Resolution 307(A)(2) adopted the definition of agritourism set forth in R.C. 901.80(A)(2): "an agriculturally related educational, entertainment, historical, cultural, or recreational activity, including you-pick operations or farm markets, conducted on a farm that allows or invites members of the

general public to observe, participate in, or enjoy that activity."

{¶ 32} R.C. 901.80(A)(4) defines "farm" as "land that is composed of tracts, lots, or parcels totaling not less than ten acres devoted to agricultural production or totaling less than ten acres devoted to agricultural production if the land produces an average yearly gross income of at least twenty-five hundred dollars from agricultural production."

{¶ 33} R.C. 519.01 provides that "agriculture"

includes farming; ranching; algaculture meaning the farming of algae; aquaculture; apiculture; horticulture; viticulture; animal husbandry, including, but not limited to, the care and raising of livestock, equine, and fur-bearing animals; poultry husbandry and the production of poultry and poultry products; dairy production; the production of field crops, tobacco, fruits, vegetables, nursery stock, ornamental shrubs, ornamental trees, flowers, sod, or mushrooms; timber; pasturage; any combination of the foregoing; and the processing, drying, storage, and marketing of agricultural products when those activities are conducted in conjunction with, but are secondary to, such husbandry or production.

{¶ 34} R.C. 519.21(C)(4) provides that a township zoning commission, board of trustees or board of zoning appeals may not prohibit agritourism in a district zoned for agriculture.

{¶ 35} It is undisputed that under Miami Township Zoning Resolution 307, a structure used exclusively for agricultural or agritourism activities qualifies for an agricultural exemption. Pursuant to Zoning Resolution 307(B), any resident claiming a structure should be exempt from permit-approval based on agriculture or agritourism

activities must submit a "Declaration of Intent – Agricultural Exception" form to the Township. The structure being exempted will not be required to have a permit on file and no fee will be required.

{¶ 36} At the hearing before the BBA, Maury Wyckoff of MCBRD testified that the stop work order was "based on the need to comply with the provisions" of the Ohio Building Code. He stated that Powlette initially asked for permission from the Township to build a chapel for church services, and the Township denied that request; Powlette then "came back and said that he was going to use the building for viticulture, which is the making of wine, and they [the Township] agreed that that would meet the definition" of an agriculturally exempt use. Wyckoff stated that Powlette subsequently began to use the barn as a wedding venue and, in May 2018, the Township issued a zoning violation due to the business use on an agriculturally zoned property. Powlette appealed the zoning violation to the BZA, claiming that the barn was an agricultural exempt building and that "any gatherings were exempt as * * agritourism." Wyckoff stated that the BZA found that the use of the property did not constitute agritourism and that it appeared that Powlette had "only attempted to * * * hastily collect features of agriculture/farming properties to cloak the operation of the wedding venue as permissible agritourism." According to Wyckoff, the BZA further concluded that Powlette's "additions" had not changed the fact that there was "insufficient connectivity between the wedding venue and the agricultural features of the property such that the wedding venue's operations remain[ed] the primary use of the property in contrast to being incidental to the overarching agricultural use of the property." Wyckoff provided a copy of the BZA's decision, which was marked as Exhibit 1.

{¶ 37} Wyckoff further testified as follows:

So, again, this is a building that is regulated by the Ohio Building Code because it does not fall under the exemptions for agriculture use. As a building used for public assembly, we have ongoing concerns about life safety at this property including structural adequacy and life safety among other compliance issues, and we ask that the Board uphold our [stop work order] which includes affirming that Mr. Powlette immediately cease using the building until he obtains permits and inspections and is issued a Certificate of Occupancy demonstrating compliance with the Ohio Building Code.

Wyckoff noted that neither his office nor the fire department and been able to gain access to the property, so they did not have firsthand knowledge of what was going on there, but they had neighbors call to tell what they were observing. According to Wyckoff, he had not had any discussions with Powlette about building code compliance or "what kind of alternatives might be available" that MCBRD could support, because Powlette had simply maintained that the building was exempt from the building code.

{¶ 38} Powlette asserted that the stop work order should be rescinded because the barn was exempt from the Ohio Building Code and because Wyckoff's actions had "waived the right to inspect at this stage by refusing to inspect the property when it was being constructed," notwithstanding that Powlette had made such demand. He also asserted that the agricultural exempt certificate had never been revoked and was not a subject of the BZA hearing. Powlette asserted that the barn housed alpacas and contained a hay loft, and that the property had been used for hay baling for the last 14

years, with over 24 acres of his property used for hay baling."

{¶ 39} When asked the age of the barn, Powlette responded that it had been started a year or year and a half earlier but still was not complete. Powlette's attorney asserted that the structure itself was "incidental" to the farming use, noting that the baling equipment was stored in the barn and it was used for agricultural purposes "365 days a year" and had been used for other purposes on "less than ten occasions." Powlette's attorney indicated that plans were submitted showing the location of the barn, but that the township did not ask for building plans, and that there was no need to submit building plans after Wyckoff "told [his] client it was not a structure subject to inspection."

{¶ 40} In response to questions from his counsel, Powlette indicated that he filed an application in 2016 to obtain current agricultural use valuation from the Montgomery County Auditor's office; Powlette identified a copy of the application. Powlette stated that the application was approved and was renewed in 2018. Powlette also identified a copy of his Declaration of Intent - Agricultural Exemption form, and he acknowledged that it required the requested information and "a property site plan along with" the application. Powlette stated that a site plan was provided and was in the possession of the Township. Alex Carlson, a Township zoning department employee, acknowledged that a site plan had been provided, but it had not contained "typical building elevations or anything else." Carlson denied that he had ever seen any drawings of the barn.

{¶ 41} Powlette stated that the barn was "multi-story" and had two cupolas at the top of the roof line, a silo, and two decks. He stated that it had two large garage doors in the lower level where equipment was stored. Powlette stated that he had been "a custom home builder in commercial buildings" since 1994 and had built approximately 30

custom homes.

**{¶ 42}** Powlette identified photos depicting his three alpacas in a fenced area and in the barn, chickens and turkeys, a fishing pond being constructed behind the barn, the barn itself, equipment in the barn, and a sign on the property from the Ohio Farm Bureau exempting the property from liability for injury or death to a participant engaged in agritourism activity. Powlette stated that the chickens and turkeys resided inside the barn from birth to two months and were then replaced with a set of new hatchlings.

**{¶ 43}** Powlette stated that an architect in Seattle had prepared plans for the construction of the barn, and that Miami Township had a copy of "those stamped drawings," which were also stamped by structural engineers. Carlson testified that he had not personally seen those drawings, but "would not refute if they [may] have been submitted elsewhere, but they're not a requirement of an agricultural exemption form." The only official submitted document of which Carlson was aware was "just a small site plan," which was not a complete set of construction drawings.

**{¶ 44}** Powlette then stated that Judge Engineering did his site plan; Powlette did not know if those plans had been stamped. Powlette stated that Kyle Hinkelman (the director of zoning) had the stamped building blueprints for Powlette's barn, and Powlette also had copies. Wyckoff stated that he had spoken to Hinkelman several times and the issue of the existence of the blueprints, but that this was not pertinent to an agricultural exemption, which does not address "the structural adequacy or lack thereof of the barn or the fire safety, you know, design of it."

**{¶ 45}** The following exchange occurred between counsel for Powlette and a board member:

[Counsel for Powlette]: To underscore some of the issues that you've raised, as we know, the code puts enforcement onto the Township. The Township has passed an ordinance as to what they are going to do in these situations related to ag exempt structures. In Miami Township * * * where my client's property is, an applicant may submit a Declaration of Intent in lieu of obtaining a zoning certificate.

So Miami Township has accepted that this is the process they're going to use, and the only thing we have to do to go along with that is provide a site plan that shows the location and size of the exempted structure. That's what [Powlette] did.

Miami Township accepted it. Miami Township has never revoked it. And so we followed the plan that we're required to follow in order to have an exempt structure. And I think even Miami Township has acknowledged they've received the site plan that detailed where the structure is and its size.

MR. MARISCALCO: Counselor, I don't mean to be argumentative with you, and I would agree that your words are correct, but judging by what's been represented to me, at least, as a site plan, a small square with a couple of scribbles does not adequately describe what this structure is.

Now, here again, it's hard to know what inquiries Miami Township actually made. If it says barn, the common understanding of barn is * * * a big pole structure, four walls and a roof, dirt floor, timbers, * * * used for livestock, hay, agricultural products.

So, here again, this may be a matter for the courts and possibly not for the Board of Building Appeals, but the site plan does lack any kind of specificity, and it reflects a barn. This is a barn of a type, and it's not designed primarily as a barn, and I think that's what the - - that's what the board is looking at is then what is this - - what is this thing to be called if not a barn.

[Counsel for Powlette]: Well, it's a structure.

MR. MARISCALO: It is a structure.

[Counsel for Powlette]: And * * * under the code the structure is exempt regardless of whether you call it a barn, an outhouse, a henhouse.

* * *

[Counsel for Powlette]: * * * I'm referring to the Ohio Revised Code and the Miami Township ordinances that are relevant to this inquiry.

* * *

[MR. CARLSON]: * * *

It was Miami Township's staff and now the official opinion of the Miami Township Board of Zoning Appeals that weddings in this case are not related to agritourism, and in that case once staff made the determination that this was not agritourism, we did in fact issue a zoning violation. * * * The Board of Zoning Appeals affirmed that decision, and that is where we are today.

* * *

MR. MARISCALCO: * * * I mean, if it turns out - - and this is not

within the purview of the Board of Building Appeals, but if it turns out that this agriculture exemption either did not apply or does not apply or no longer applies, * * * then the structure would come under the Ohio Building Code and compliance would be required?

[Counsel for Powlette]: Well, that would lead me to my second argument of waiver. * * *

{¶ 46} Wyckoff requested a sealed and stamped copy of the construction documents for the barn. Powlette stated that Judge Engineering drew the site plan. He stated that his initial Declaration of Intent was filed "a year or a year and a half ago" (it was dated October 4, 2017) and included the site plan, that a second one was filed on July 6, 2018, and that the only difference between the two was adding "agritourism." Wyckoff further stated:

* * * I would never tell somebody that we don't inspect barns without the discussion clearly being we don't inspect agricultural exempt barns. And so if somebody has held something out to be ag exempt and - - then, therefore, we would have no reason to inspect, and we certainly would not go out and look at footings without having already looked at drawings and determined whether the drawings indicated a code-compliant solution.

And once that happened, then we would issue a permit, and then we could inspect construction for compliance with a permit set of drawings.

But if somebody has not obtained a permit and asks us to come out and inspect, whether it's Mr. Powlette or anybody else, we say we don't do inspections until we issue a permit, and then we'd have drawings because

our inspectors are not just inspecting to say, geez, that looks like a good amount of concrete or that looks like a nice depth. They look at what did the engineers say the design was supposed to be and did we accept the engineering; for instance, when you talk Mr. Mariscalco, about looking at the engineering, did the building meet all of the live load and dead load requirements for the proposed use. If I saw drawings and found they didn't, I wouldn't approve the drawings and therefore I wouldn't inspect something that might potentially be a deficient design.

{¶ 47} Wyckoff directed the board's attention to a case from Greene County that made its way to this court in *Dixon v. Caesarscreek Township Bd. of Zoning Appeals*, 2d Dist. Greene No. 2018-CA-1, 2018-Ohio-2549. Counsel for Powlette observed that, in *Dixon*, "the Township argued that a wedding was not agritourism, and the judge "had every opportunity" to declare that weddings were not agritourism, but did not do so. In response, Wyckoff focused on Exhibit 1, the BZA decision in a previous case, which addressed *Dixon* in detail.

{¶ 48} We note that Exhibit 1 reflects that Cheryl Dixon provided public comment on Powlette's barn to the BZA. The BZA decision stated:

Cheryl Dixon testified that she is not a resident of Miami Township, but she heard about the Appeal on the news and was involved in a similar dispute previously. Ms. Dixon testified that she owns farm property in Xenia, Ohio on which she rehabbed a home and a barn that was originally constructed in the 1800s. Ms. Dixon testified that she hosted weddings on her farm up until about five years ago when the local government informed

her that her use of the agriculturally-zoned property was prohibited. Ms. Dixon testified that a lawsuit ensued, ultimately ending up in front of the Second District Court of Appeals of Ohio. Ms. Dixon testified that the Second District upheld weddings and other celebratory events held on farms as agritourism. Ms. Dixon testified that weddings are very common on smaller farms throughout the U.S. because holding these events allows owners of small farms to turn a profit. When describing how she hosts weddings on her property, Ms. Dixon stated that the weddings are held outside, with herself and her husband present during the events. Ms. Dixon testified that she has denied requests from renters to hold weddings in the barn on her property because she uses the barn to house her livestock. Ms. Dixon testified that, during the event, she and her husband are engaged with guests, discussing the farm and its history, and give guided tours of the property to wedding guests in between the wedding ceremony and reception. Ms. Dixon testified that it is her belief that the production of hay on [Powlette's] property is a sufficient agricultural activity to consider weddings held on the property as agritourism.

(Footnotes omitted.)

{¶ 49} In the BZA's decision, in its Conclusions of Law, the BZA determined in part as follows:

E. The BZA concludes that the Ohio Second District Court of Appeals did not hold in [*Dixon,* 2d Dist. Greene No. 2018-CA-1, 2018-Ohio-2549] that weddings are per se agritourism activities under the [Revised Code].

1.   In light of Cheryl Dixon's testimony that the Ohio Second District Court of Appeals has upheld weddings on farms as agritourism within the meaning of R.C. 901.80, the BZA feels it necessary to analyze Ms. Dixon's court case and ensure its decision is consistent with the Court's holding. The administrative appeal was originally filed in the Greene County Common Pleas Court in 2017.   Ms. Dixon brought the appeal to dispute the partial denial of her Application for Agritourism Activity by the Caesarscreek Township BZA * * *."   The Caesarscreek BZA approved Ms. Dixon's application to conduct certain activities on her property it found to be agritourism within the meaning of the [Revised Code] and its Zoning Resolution, but prohibited her from hosting "theme based weddings, receptions, birthday celebrations and reunions," finding that they were not "agriculturally related."   Ms. Dixon thereafter filed an administrative appeal to the decision with the common pleas court.   While Ms. Dixon was correct in her testimony that the court reversed the Caesarscreek BZA's decision, her testimony as to the court's rationale was not accurate.   The court reversed the BZA's decision because the court found no evidence to support the BZA's determination to exclude theme-base events from Ms. Dixon's agritourism activities.   The court also found the transcript and record devoid of any explanation as to how or why the BZA came to its decision.   As such, the court found the decision to be arbitrary and capricious.   The Caesarscreek BZA appealed the common pleas court decision and the case proceeded on to the Second District Court of

Appeals. The sole issue considered by the Second District was whether the common pleas court abused its discretion by failing to conduct an evidentiary hearing at the trial level. The Second District found the common pleas court had not abused its discretion and upheld the lower court's decision. Contrary to Ms. Dixon's testimony, neither of the courts involved in this case held that weddings are per se agritourism activities. In fact, neither court even considered that question. The courts merely held that the record of the Caesarscreek BZA hearing on Ms. Dixon's Application was insufficient to support its decision prohibiting theme-based events on her property.

2. Further, the BZA notes that there are important differences in how Ms. Dixon holds weddings on her farm versus how weddings are held on [Powlette's] property. First, Ms. Dixon testified that she advertises weddings on her farm as "farm weddings," which are held outside with guests immersed in the agricultural features of the Property. Additionally, Ms. Dixon testified that both her residence and the barn on her property were originally built in the 1800s, providing her property with a historical aspect [Powlette's] property lacks. Ms. Dixon also testified that she gives guests an informational tour of the property during the wedding cocktail hour. Finally, Ms. Dixon's testimony indicates that the primary purpose of her property is agricultural, evidenced by the fact that Ms. Dixon testified that she has been asked if weddings could be held in the barn on her property and she said it could not be done because the barn is used to

house her livestock. In contrast, [Powlette] does not promote the Wedding Venue by advertising a farm theme or the agricultural aspects of the Property, evidenced by [his] own testimony and that of the Millers. Unlike Ms. Dixon's farm, [Powlette's] Property is not used primarily for agricultural purposes, and lacks traditional farm features and historical structures. The overall manner in which [Powlette] operates the Wedding Venue also differs from how Ms. Dixon is engaged with guests during the events and even gives a guided tour of the property during cocktail hour. No evidence was presented showing that [Powlette] engages with wedding guests during events in any manner, let alone in an agriculturally-related manner. To the contrary, Cheryl Turton testified that when she called [Powlette] to inform him that wedding guests were reaching onto her property to pet her horses, Appellant stated he was unaware that was happening because he had been asleep.

3. Given the fact that the Second District Court of Appeals has not held that weddings are per se permissible under the agritourism statute, the BZA finds Ms. Dixon's testimony does not alter its previous conclusion. Therefore, the BZA concludes [Powlette's] use of the property on May 8th did not constitute agritourism under the [Revised Code].

{¶ 50} Wyckoff also asserted that he had taken and shown to the BZA some screen shots he had captured from the Stoney Hill Bed and Breakfast website, which showed the barn and identified the barn as 5,000 square feet on the main level and 3,500 square feet on the lower level, with 1,400 square feet decks overlooking the pond and the

horse stable and a 1,000 square foot covered porch. The website also stated that the barn would comfortably seat about 200 people.

{¶ 51} At the conclusion of the hearing, counsel for Powlette agreed to provide the MCBRD with copies of the site plan and "hard copies" of the stamped drawings. Carlson agreed to provide Wyckoff with "the original zoning certificate." None of those documents are in the record before us.

{¶ 52} As noted above, Wyckoff asked the MCBRD to uphold the stop work order, including that. Powlette be required to immediately cease using the building until he obtained permits and inspections and was issued a Certificate of Occupancy demonstrating compliance with the Ohio Building Code. The trial court determined that reliable, probative and substantial evidence supported the MCBRD's decision that the barn was used for both agricultural and public assembly occupancy purposes. We agree.

{¶ 53} R.C. 3781.06(A)(1) provides:

Any building that may be used as a place of resort, assembly, education, entertainment, lodging, dwelling, trade, manufacture, repair, storage, traffic, or occupancy by the public, any residential building, and all other buildings or parts and appurtenances of those buildings erected within this state, shall be so constructed, erected, equipped, and maintained that they shall be safe and sanitary for their intended use and occupancy.

{¶ 54} R.C. 3781.11 provides:

* * * Any building, structure, or part thereof, constructed, erected, altered, manufactured, or repaired not in accordance with the statutes of

this state or with the rules of the board, and any building, structure, or part thereof in which there is installed, altered, or repaired any fixture, device, and material, or plumbing, heating, or ventilating system, or electric wiring not in accordance with such statutes or rules is a public nuisance.

{¶ 55} Powlette hosts weddings at his barn, and he has been ordered to stop work by the MCBRD, cited by the BZA, and cited by the Fire District. The Fire District citations were affirmed by the State Board of Building Appeals and remain in effect. Wyckoff testified that there was an unapproved or impermissible change of use regarding the barn, and we conclude that the barn cannot retain its agricultural exemption under these circumstances, given the issues of fire safety and life safety for the attendees of the events in the barn. In other words, the barn is a nuisance, and when MCBRD became aware of the nature of its use, it correctly issued the stop work order and essentially negated the exemption. The trial court did not err in affirming the BBA's determination that Powlette cannot escape application of the Ohio Building Code to his barn, since it is clearly an assembly occupancy and promoted as such. Accordingly, Powlette's first assignment of error is overruled.

{¶ 56} Powlette's second assignment of error is as follows:

THE TRIAL COURT'S DETERMINATION THAT THE MONTGOMERY COUNTY BUILDING INSPECTOR WAS NOT ESTOPPED FROM ISSUING THE STOP WORK/ADJUDICATION ORDER IS CONTRARY TO LAW AND AN ABUSE OF DISCRETION.

{¶ 57} Powlette asserts that over several weeks and months, he had multiple conversations with Wyckoff and Robert Martin about conducting inspections of the barn

on his property and, on each occasion, "Montgomery County refused to inspect" it.   He argues that Wyckoff and Martin made representations to him on which he relied, and that he (Powlette) spent hundreds of thousands of dollars constructing the barn and "suffered tremendous pecuniary loss" based on this reliance.

**{¶ 58}** MCBRD responds that it would be "a ridiculous policy" to allow structural and life safety compliance inspections to be waived for structures that were going to be occupied by human beings.   MCBRD also asserts that it had no reason to inspect an agriculturally exempt building, as Powlette represented the building to be, and it only later learned that the building was not used exclusively for agriculture and needed to comply with additional requirements.

**{¶ 59}**   This Court has noted:

"In a claim for promissory estoppel, 'a plaintiff may enforce a clear and unambiguous promise, even in the absence of the consideration necessary to form a contract, if the plaintiff reasonably relies on the promise to his or her detriment.' " *Wells Fargo Fin. Ohio 1, Inc. v. Robinson*, 2d Dist. Champaign No. 2016-CA-23, 2017-Ohio-2888, ¶ 21, quoting *Americana Inv. Co. v. Natl. Contr. & Fixturing, LLC*, 10th Dist. Franklin No. 15AP-1010, 2016-Ohio-7067, ¶ 12.

*Nationstar Mtge. LLC v. Abston*, 2019-Ohio-3003, 140 N.E.3d 1103, ¶ 23 (2d Dist.).

**{¶ 60}** Powlette directs our attention to *Pilot Oil Corp. v. Ohio Dept. of Trans.*, 102 Ohio App.3d 278, 656 N.E.2d 1379 (10th Dist.1995), wherein the Tenth District noted that estoppel may apply where a municipality made a representation, which was within its power to make and which induced reliance.   *Id.* at 283, citing *Cleveland v. Cleveland*

*Elec. Illum. Co.,* 440 F.Supp. 193. (N.D.Ohio 1976). In *Pilot Oil*, the court concluded that the Ohio Department of Transportation ("ODOT") was estopped from denying the validity of its prior approval of a sign. ODOT had exercised its discretion in interpreting R.C. 5516.02(C) and had determined that appellant's proposed sign complied with that statutory provision. *Id.* at 283. The court found it significant that ODOT had "had full opportunity to be informed" prior to making its decision. The court further found that ODOT's approval had induced appellant to go ahead with the construction and erection of its sign. The supervisor of the advertising device control section of ODOT had been authorized to approve the proposed sign, and therefore it was reasonable for appellant to rely on his approval. *Id.*

**{¶ 61}** Unlike in *Pilot Oil*, in this case MCBRD did not initially have full opportunity to be informed about Powlette's barn. Powlette initially requested permission to build a chapel for church services on the property, and that request was denied. We conclude that that request was consistent with the nature of the project that Powlette intended, namely one with insufficient connectivity to the agricultural features of the land to be agriculturally exempt. Powlette's subsequent July 6, 2018 Declaration of Intent merely listed agriculture, agritourism, hay storage, turkeys, chickens, and viticulture as uses. In other words, the declaration did not put building officials on notice that the barn was subject to the Ohio Building Code, because Powlette did not disclose that a primary purpose of the structure was to host weddings there.

**{¶ 62}** By his own account, Powlette was an experienced builder. He was undoubtedly aware of the Ohio Building Code and its requirements, and he attempted to circumvent them. As Wyckoff explained, Section 105.1 of the Ohio Building Code

provides:

> Approvals required. Any owner or authorized agent who intends to construct, enlarge, alter, repair, move, or change the occupancy of a building or structure, or portion thereof, or to erect, install, enlarge, alter, repair, remove, convert or replace any electrical, gas, mechanical, plumbing system, other building service equipment, or piping system the installation of which is regulated by this code, or to cause any such work to be done, shall first make application to the building official and obtain the required approval.

**{¶ 63}** Further, Section 106.1 provides:

Submittal documents. Construction documents, statement of special inspections required and other data shall be submitted in two or more sets with each application for an approval.   Before beginning the construction of any building for which construction documents are required under section 105, the owner or the owner's representative shall submit construction documents to the building official for approval. When construction documents have been found to be in compliance with the rules of the board of building standards in accordance with section 107 by a certified building department, that determination of compliance shall be deemed sufficient to obtain approval for construction pursuant to section 105.2 and the building official shall issue the certificate of plan approval. * * *

**{¶ 64}** Carlson stated that Powlette submitted a site plan that was not complete. After reviewing the nature of the structure, Mariscalco noted that it was not designed

primarily as a barn. Wyckoff stated that Powlette represented that the barn was agriculturally exempt, and that MCBRD had no duty to inspect the barn unless a permit was issued for its construction pursuant to the Ohio Building Code. The trial court did not err or abuse its discretion in concluding that Powlette's estoppel argument was without merit and that MCBRD was not estopped from issuing the stop work order after being made aware of the true nature of the building,. Powlette's second assignment of error is overruled.

{¶ 65} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and WELBAUM, J., concur.

Copies sent to:

Gregory S. Page
Mathias H. Heck, Jr.
Nathaniel S. Peterson
Hon. Richard Skelton